PATRICK CUDDY *vs.* PEOPLE'S ICE COMPANY.
JAMES P. THAYER *vs.* SAME.

Suffolk.   January 20, 21, 1891. — February 27, 1891.

Present: FIELD, C. J., W. ALLEN, C. ALLEN, HOLMES, & MORTON, JJ.

*Personal Injuries — Negligent Construction — Fall of Building —
Departure from Architect's Plan.*

If a corporation in erecting a building departs from the architect's plans, and its
president actively interferes in directing the removal of stays, thus impairing
the strength of the structure, and the building falls under circumstances show-
ing that it was not strong enough, an action against the corporation for personal
injuries thereby caused to one employed by it in the work of construction is
properly submitted to the jury.

TWO ACTIONS of tort for personal injuries occasioned to the
plaintiffs by the fall of the defendant's icehouse while employed
in its construction by the defendant.   The cases were tried to-
gether in the Superior Court, before *Dunbar*, J., who refused to
rule, as requested by the defendant, that there was no evidence
upon which the actions could be maintained, and submitted the
cases to the jury, and the defendant, after verdicts for the plain-
tiff in each case, alleged exceptions, which, so far as material to
the points decided, appear in the opinion.

*R. M. Morse, Jr.,* (*J. Lowell, Jr. & C. E. Hellier* with him,)
for the defendant.

*E. Greenhood,* (*R. H. O. Schulz* with him,) for the plaintiffs.

C. ALLEN, J.   The defendant's only exception is to the refusal
of the court to withdraw the cases from the jury.

Omitting any consideration of the question whether the de-
fendant would be responsible for defects in the plan of construc-
tion prepared by the architect, there was evidence on which the
jury might find that the defendant departed from the plan, in
one particular at least, which impaired the strength of the
structure, and also that the defendant, by Otis H. Weed, its
president, interfered actively in directing the removal of stays,
which had a similar effect.

Bean, the architect, testified that " one of the plans calls for
a cross partition through the centre of the block of houses";

that "all the plans were made upon the theory that a centre partition was to be run through the house"; that he did not authorize Weed to take out this partition; that if there was no such partition, it made quite a difference in the strength; that he thought that was always important; and that he "should consider it very dangerous without a centre wall through the centre of the block, to board up an ice-house, as it has been stated here that this one was." Weed testified that he procured the plans, which were approved by the directors; that he employed one Leavitt to build the building, and gave to him the plans to frame the building; that "the sill of the partition called for, running through the centre of the building, was put in. Mr. Leavitt changed it. Don't recollect consulting the architect. . . . I think I assented to the change suggested by my subordinate [Leavitt], without consulting the architect." He also testified: "There was to be a partition that ran across through all the houses if we put up the studding. The sill we put in as Mr. Bean directed. He said we could stud it or not, as we saw fit. We did not put in the studding. Mr. Leavitt said that it was of no advantage. . . . That was the only change I know of in the plans."

There was also evidence tending to show that the building was insufficiently stayed; that the stays were removed too soon; that this impaired the strength of the structure; and that Weed directed, or at least sanctioned, such removal. Gaffney, one of the carpenters, testified as follows: "We were short of boards one day, and he [Weed] told me he thought we were boarded up far enough, so we might take the stays off. I told him I didn't think it was best to take them off, unless we put one in place of them. . . . I didn't take any stays off, because I was sent off somewhere else. Weed looked around on both sides, and thought we might dispense with some of the stays, and use them. He said we had got short of boards." Although Gaffney did not remove any stays at that time, there was other evidence tending to show that stays were in fact removed, and that Weed knew it; and the jury might find that he sanctioned or directed such removal. Durvin, a laborer, testified that he removed some of the stays the Monday before the building fell; that Kerr, who was in charge of the laborers, ordered him to do this; that he got through doing it about dark on Monday afternoon;

and that Weed was there a part of the time in the evening, but not when he commenced taking away the stays. Kerr was employed by the defendant all the year round, but was not a witness at the trial. The plaintiff Thayer, who was a carpenter, testified that he went to work on the building the week before it fell; that there were then no stays on the inside; that Weed hired him, and gave him directions as many as three different times during the six days he was there; that on Monday, before the building fell, he [Thayer] was going to saw some twelve-foot boards in two, and make them six feet in length, and Weed objected to it, and thought he had better use longer boards; that there were some longer boards that were formerly stays, which stood right upon the wall. Four witnesses, Durvin, Gaffney, and the plaintiffs Thayer and Cuddy (who sorted boards and carried the lumber to the carpenters), testified to receiving orders respecting their work from Weed. Weed himself, while contradicting certain statements made by some of these witnesses, and denying that he gave any orders to Gaffney or to anybody else to remove the stays, admitted that he had knowledge of their removal. He said, "During the week previous to the fall of the house, I saw the stays down on the north side, and the side was boarded up. . . . I don't think that any of the stays remained on the railroad end of the house at the time the building fell. I noticed they took them down as they boarded up. . . . When in boarding they came up to where the stays were, they would knock them off. I don't think they were restored. I did not at any time forbid any braces or stays to be taken down. . . . In boarding up, I noticed that when they got to a stay they would take it off. They could not board where the stay was without taking it off." In respect to this last statement, Colburn, who was one of the framers, testified that those who were boarding could easily get around the stays, and leave them, and that there was no necessity for removing them; and other witnesses testified that it was unsafe to remove them before the building was boarded up.

The fact that the building fell, under the circumstances stated, showed that it was not strong enough, and the jury might have found that one or both of the above elements of weakness contributed to its fall. *Exceptions overruled.*